[No. 35237-1-II.   Division Two.   February 20, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES RYAN KENYON, *Appellant*.

*Thomas E. Doyle* and *Patricia A. Pethick*, for appellant.

*Gary P. Burleson, Prosecuting Attorney*, and *Edward P. Lombardo, Deputy*, for respondent.

¶1 QUINN-BRINTNALL, J. — James R. Kenyon appeals his conviction for seven counts of first degree unlawful posses-

sion of a firearm, arguing that (1) the trial court violated his speedy trial rights and (2) insufficient evidence supported the jury's verdict finding him guilty on counts I, II, and III. As demonstrated in the published portion of the opinion, Kenyon's trial was timely under CrR 3.3. In the unpublished portion of this opinion, we review the evidence supporting the jury's verdict and hold that it is sufficient as a matter of law. Accordingly, we affirm.

## FACTS

PROCEDURAL HISTORY

¶2 On August 3, 2006,[1] the State charged Kenyon by fourth amended information with seven counts of first degree unlawful possession of a firearm, contrary to former RCW 9.41.040(1)(a) (2003).

¶3 On March 13, Kenyon appeared before the trial court for an omnibus hearing. Kenyon's attorney requested a continuance of the hearing so that he could conduct "some further investigat[ing]" and interview "several witnesses in different statuses of custody." 1 Report of Proceedings (RP) at 1. Kenyon's attorney stated that he was not sure how long it would take to conduct his investigation and, thus, he would not make "a strenuous objection to continuing the [initial] trial date if it comes to that." 1 RP at 2. The trial court continued the hearing until March 27.

¶4 On March 27, Kenyon appeared before the trial court for his omnibus and pretrial hearing. Defense counsel informed the trial court that he was awaiting transcripts of testimony from a previous related trial. Defense counsel also indicated that he was anticipating several reports from his investigator.

¶5 On April 7, Kenyon appeared before the trial court for a readiness hearing. Due to "a number of outstanding discovery issues," Kenyon's attorney requested that the trial court continue the case. 1 RP at 12. Specifically,

---

[1] All subsequent dates occurred in 2007, unless otherwise indicated.

Kenyon's attorney "identified a couple of . . . persons of interest that [he] want[ed] to interview." 1 RP at 13. At the hearing, Kenyon waived his right to a speedy trial and a new speedy trial deadline of June 6 was set. The trial court scheduled Kenyon's new readiness hearing for May 19.

¶6 On May 19, Kenyon's attorney requested another continuance, but Kenyon himself objected to the continuance and refused to sign the paperwork. The court noted that the final start date remained June 6. The trial court rescheduled Kenyon's readiness hearing for May 26.

¶7 On May 26, Kenyon appeared for his readiness hearing and his attorney informed the court that Kenyon had faxed him a "Motion for Change of Attorney" because Kenyon believed his attorney was taking too long to prepare his case for trial. *See* 1 RP at 24. Kenyon's attorney noted that, while Kenyon was frustrated that the case had been continued several times and perceived it as a relatively simple litigation, he felt it was "somewhat more complicated" because Kenyon was facing multiple felony charges and faced a long prison term if convicted. 1 RP at 25. Kenyon's attorney also noted that there was "a lot of discovery in this case, and [that] this discovery's span[ned] years of time." 1 RP at 25. Kenyon's attorney also informed the court that he had not yet received the report from his private investigator. The trial court found Kenyon's motion without merit and denied his request to change attorneys. In addition, the State noted that it was having some discovery issues. Kenyon's attorney also indicated that it was having "ongoing discovery issues" and needed to interview at least one person prior to trial. 1 RP at 28. The trial court reset the readiness hearing for June 2.

¶8 On June 2, Kenyon appeared for his readiness hearing, and both his attorney and the State indicated that their respective discovery issues had not been resolved. The trial court reset the readiness hearing for June 5.

¶9 On June 5, Kenyon's attorney reiterated that his investigative reports were still not done. Kenyon's attorney also stated that he had "another individual" that he and

Kenyon wanted to interview and that he would like a 30-day continuance under *State v. Campbell*.[2] 1 RP at 43. Kenyon's attorney remarked that, although he had not been able to interview all of the potential witnesses, everyone had been cooperative. Kenyon himself objected to the continuance. The trial court granted the continuance, with a new final trial start date of July 5. The trial court then set the readiness hearing for June 7, with trial to start potentially as early as the next day.

¶10 On June 7, Kenyon's attorney reiterated that he needed to interview several individuals prior to trial and that "[a]lthough all parties are being cooperative . . . there's a lot of people involved in different situations." 1 RP at 49. The trial court rescheduled the readiness hearing for June 23. On that date, Kenyon's attorney indicated that he still needed to interview several witnesses that he had not been able to contact through the prosecutor's office. When the trial court asked for a list of the witnesses that he needed to interview, Kenyon's attorney stated that he did not have the names of who had been interviewed and who had not. The trial court rescheduled the hearing for June 26.

¶11 On June 26, Kenyon's attorney informed the court that he still had not interviewed all the witnesses and requested that the case be set for a new readiness hearing on June 30.

¶12 On June 30, the trial court informed the parties that during July there would only be one trial court in Mason County because one of the two judges was on vacation. Kenyon's attorney requested that the trial court set a status hearing for July 5.

¶13 On July 5, the trial court informed the parties that another criminal case was being tried and that it would likely continue through July 6. Kenyon's attorney moved to dismiss the case "pursuant to the speedy trial rules," but

---

[2] *See State v. Campbell*, 103 Wn.2d 1, 14-15, 691 P.2d 929 (1984) (holding that there is no abuse of discretion in granting a continuance to allow counsel to prepare defense over the defendant's objection), *cert. denied*, 471 U.S. 1094 (1985).

the trial court declined to do so. RP (July 5, 2006) at 2-3. The trial court stated that it was not continuing the trial because of "court congestion" but rather because of "unavailability." The trial court stated that the "unavailability" was "an unavoidable circumstance" because there was only one judge available and the judge was hearing a case that had not yet concluded. RP (July 5, 2006) at 4. The trial court noted it would call Kenyon's case again on July 6 for a status conference.

¶14 On July 7, the trial court informed the parties that the other criminal case was still pending but that it would sign an order regarding the "excluded period." 1 RP at 65. The trial court stated that the "excluded period" would end as soon as the other case concluded. 1 RP at 66. The deputy prosecutor reminded the trial court that he would be out of the office the week of July 9 "on a long-scheduled matter." 1 RP at 66. In addition, the State noted that it was prepared to begin a different trial that had "been specifically set to start [July 7]". 1 RP at 66.

¶15 On July 17, the trial court called the case for a status hearing. The trial court noted that the jury in the conflicting case was deliberating, and that "the [trial court] is available at this time to try the *Kenyon* case, so the unavailability period ends today." 1 RP at 72-73. Kenyon's attorney renewed his request to dismiss due to "court congestion," but the trial court reiterated that the "unavailability" was actually an "unforeseen circumstance" and, thus, a valid excluded period under CrR 3.3(e)(8).[3] *See* 1 RP at 72.

¶16 Kenyon's trial began on August 1. On August 3, the jury found Kenyon guilty as charged of seven counts of first degree unlawful possession of a firearm. On August 21, the trial court sentenced Kenyon to 232 months in prison.

---

[3] CrR 3.3(e)(8) excludes "[u]navoidable or unforeseen circumstances affecting the time for trial beyond the control of the court or of the parties" when computing time for trial.

STATEMENT OF FACTS—COUNTS I, II, AND III[4]

¶17  On August 1, Kenyon stipulated to a prior conviction for second degree arson, a "serious offense" defined by RCW 9.41.010(12)(a).

¶18  David Stiner, Kenyon's friend, testified that a week or so before June 30, 2005, Kenyon gave him a gray lockbox to give to Jana Newhouse or David Reading. The box was locked, but, although Stiner did not open the box, he was able to tell that something was inside because it was heavy. Stiner put the box in Newhouse's trailer. Stiner testified that the box was a lockbox with a combination lock. Stiner further testified that the gray metal box entered into evidence was "probably" the same box Kenyon gave him because it also had a combination lock.

¶19  Stiner also testified that in the week or so prior to June 30, 2005, Kenyon asked him "if [he] knew anybody that was looking to buy a couple of handguns." 2 RP at 144. Stiner further testified that "there was [sic] two other people" with Kenyon when he made the inquiry and, although they "had [the guns] in their hands[, Kenyon] was just the one doing the talking." 2 RP at 144-45. Stiner identified "the guns" as the 9 mm Smith & Wesson and the Hungarian-made 9 mm. Stiner further testified that Kenyon "could have" had physical possession of the weapons because he was the one who was asking about buyers. 2 RP at 145. When Stiner asked Kenyon where he obtained the guns, Kenyon told him "they belonged to a [girl] friend of his, and he was trying to sell them." 2 RP at 153.

¶20  Officer Steve Valley of the Department of Corrections testified that, after he arrested Reading, another of Kenyon's friends, for an unrelated crime, he searched Reading's home and recovered "three boxes in [a] trailer; a red box, a locked footlocker, and another little gray box that

---

[4] The State also charged Kenyon with four additional counts of unlawful possession of a firearm. But Kenyon does not challenge the sufficiency of the evidence supporting those particular counts.

was located also in the trailer." 2 RP at 134. The "small gray box" was "inside the big metal footlocker," but Valley could "not recall if [the small gray box] was locked or open." 2 RP at 134.

¶21 Officer Valley further testified that he found "two handguns inside" the gray metal box: a Hungarian-made 9 mm handgun and a .38 caliber Smith & Wesson. 2 RP at 135. On cross-examination, Valley testified that he found a 9 mm Smith & Wesson in "a red box in the trailer." 2 RP at 136.

¶22 During direct examination, Detective Luther Wade Pittman from the Mason County Sheriff's Department performed a demonstration with the three firearms and the gray box. Pittman showed that when he removed the safety tags from all three handguns, they "would fit in the [gray] box." 3 RP at 232.

¶23 Destiny Meehan testified that on October 14, 2004, she was driving in her car with Kenyon when they were pursued and subsequently detained by law enforcement. Meehan testified that during the chase, Kenyon threw a 9 mm firearm out of the car window. Meehan later retrieved the gun for Kenyon and identified it at trial as the 9 mm Smith & Wesson that the police had recovered from Reading's trailer.

¶24 The State recorded several conversations between Kenyon and Reading while Kenyon was in jail awaiting trial. Portions of these conversations were admitted and transcribed for the jury. Not long after the search of Reading's trailer, these conversations revealed that he and Kenyon discussed "these guns." Clerk's Papers (CP) at 72. Reading asked Kenyon whether "any of 'em [are] stolen," and Kenyon responded, "[n]ope." CP at 72. In another conversation, Kenyon told Reading that "[t]hey knew [about] the one 9 mm." CP at 72. Kenyon reiterated that the "9 mm" was not stolen. CP at 72.

¶25 In the published portion of this opinion, we address Kenyon's challenge to the timeliness of his trial.

ANALYSIS

SPEEDY TRIAL

¶26 Kenyon argues that the trial court did not have "good cause" to continue his trial beyond the last allowable start date of July 5, because courtroom unavailability is not good cause to continue a criminal trial. Br. of Appellant at 7. The State responds that the continuance was not due to courtroom unavailability but, rather, unavoidable circumstances because the only judge available to hear the case was in trial on another case. The State further argues that Kenyon's attorney requested several of the extensions and continuances that pushed Kenyon's trial beyond his speedy trial deadline.

■■ ¶27 A criminal charge not brought to trial within the time limits of CrR 3.3 must be dismissed with prejudice. CrR 3.3(h).[5] We review the application of the speedy trial rule de novo. *State v. Carlyle*, 84 Wn. App. 33, 35-36, 925 P.2d 635 (1996).

■■ ¶28 The trial court is ultimately responsible for ensuring compliance with the speedy trial period. CrR 3.3(a). But the State bears the primary duty to bring the defendant to trial in a timely manner. *State v. Jenkins*, 76 Wn. App. 378, 383, 884 P.2d 1356 (1994), *review denied*, 126 Wn.2d 1025 (1995). CrR 3.3 requires the court to set a criminal trial date within 60 days of arraignment for an in-custody defendant. CrR 3.3(b)(1)(i). When the applicable speedy trial period has expired, the court must dismiss the charges if the defendant objects within 10 days of the trial, even if the defendant has not suffered prejudice. CrR 3.3 (d)(3), (h); *State v. Swenson*, 150 Wn.2d 181, 187, 75 P.3d 513 (2003); *State v. Striker*, 87 Wn.2d 870, 875-77, 557 P.2d 847 (1976); *State v. Earl*, 97 Wn. App. 408, 410, 984 P.2d 427

---

[5] CrR 3.3 was revised effective September 1, 2003. *State v. Johnson*, 132 Wn. App. 400, 411, 132 P.3d 737 (2006), *review denied*, 153 P.3d 196 (2007). All references to CrR 3.3 are to the current version of the rule, unless otherwise indicated.

(1999). But the speedy trial rules contain several exceptions that extend the speedy trial time beyond 60 days. Excluded periods under CrR 3.3(e) include continuances and delays due to unavoidable or unforeseen circumstances that are beyond the control of the court or of the parties. CrR 3.3(e)(3), (8).

¶29 We review the trial court's decision to grant or deny a motion for a continuance for abuse of discretion. *State v. Johnson*, 132 Wn. App. 400, 411, 132 P.3d 737 (2006), *review denied*, 153 P.3d 196 (2007). Under former CrR 3.3 (1971), routine court congestion was not "good cause" to continue a criminal trial beyond the prescribed time period.[6] *State v. Mack*, 89 Wn.2d 788, 794, 576 P.2d 44 (1978). And courtroom unavailability was considered synonymous with "court congestion." *State v. Kokot*, 42 Wn. App. 733, 736-37, 713 P.2d 1121, *review denied*, 105 Wn.2d 1023 (1986). Furthermore, in order to show that court congestion is "unavoidable," the trial court had to make a careful record of why each superior court department was unavailable and whether a judge pro tempore could have reasonably been used. *State v. Warren*, 96 Wn. App. 306, 310, 979 P.2d 915, 989 P.2d 587 (1999). Without "good cause" for the continuance, dismissal was required. *Mack*, 89 Wn.2d at 794.

¶30 But the continuing viability of *Mack* and similar cases remains an open question. It is clear that the relaxation of the speedy trial rule was meant to transition from

---

[6] The State relies heavily on *State v. Flinn*, 154 Wn.2d 193, 110 P.3d 748 (2005), to support its proposition that a continuance can be granted for "good cause" based on judge unavailability. But the State's reliance on *Flinn* is misplaced. First, *Flinn* addresses former CrR 3.3, not the current version of the speedy trial rule. Furthermore, in *Flinn*, the trial court did not grant the continuance because of its own unavailability, but rather it granted the continuance in order to give the State an opportunity to conduct a psychiatric examination of the defendant. 154 Wn.2d at 200. The trial court simply took its scheduled judicial conference into account when determining the length of the continuance. *Flinn*, 154 Wn.2d at 200-01. The *Flinn* court made clear that if the judicial conference were the only reason for the continuance, it would be similar to court congestion and the trial court would have had to document the details of unavailable courtrooms and judges. 154 Wn.2d at 200-01. But because the judicial conference was not the reason for the continuance, the defendant had to show that the "good cause" found was manifestly unreasonable. *Flinn*, 154 Wn.2d at 200-01.

a hypertechnical application of the rules to one that allowed more time for the State, defense counsel, and the trial court prepare for trial.[7] Here, although the trial court did not look into the availability of pro tempore judges, it is clear that the conflict between the judge's longstanding vacation and Kenyon's trial was due to Kenyon's repeated requests for continuances and extensions—Kenyon's attorney made no fewer than eight requests to continue the trial or reschedule hearings because he was unprepared to move forward. Furthermore, there was no unnecessary delay because the court commenced trial as quickly as possible following defense counsel's completion of trial preparation; the trial court scheduled the trial for August 16, but moved it up to the earliest available trial date, August 1.[8] Under the circumstances presented in this record, Kenyon's trial was timely under CrR 3.3.

¶31 Affirmed.

¶32 A majority of the panel having determined that the remainder of this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BRIDGEWATER and HUNT, JJ., concur.

Review granted at 164 Wn.2d 1013 (2008).

---

[7] We are not unmindful of the recent proliferation in continuances in the trial courts. But here, with each continuance, the court was careful to document the reason.

[8] Kenyon also suggests that the trial court has a sua sponte duty to request a pro tempore judge. But we have found no support for this claim. While case law reprimands the trial court for failing to find a pro tempore judge in cases where it failed to do so, the issue of who must request the pro tempore judge has not been addressed. *See Warren*, 96 Wn. App. at 310; *see also State v. Silva*, 72 Wn. App. 80, 84, 863 P.2d 597 (1993). Here, Kenyon did not request a pro tempore judge because he was unprepared to go to trial on July 5.